**COMMONWEALTH OF KENTUCKY**
Appellant,

v.

**Lloyd A. PRIDDY Appellee.**

**No. 2003–SC–000041–DG.**

Supreme Court of Kentucky.

Dec. 22, 2005.

Rehearing Denied March 23, 2006.

---

Gregory D. Stumbo, Attorney General, Janine Coy Bowden, Assistant Attorney General, Frankfort, Counsel for Appellant.

Donna Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, Counsel for Appellee.

SCOTT, Justice.

## I. INTRODUCTION

Appellee, Lloyd A. Priddy, sought to suppress the fruits of a search of his person by a police officer during the course of a stop of his vehicle. In denying the motion, the trial court made findings—which Appellee argues were contained only in the uniform citation issued by the officer—that the stop, and thus the search, was justified

pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The citation had been filed in the court record and was used and referred to in the hearing by the parties and the court, but it was never formally filed as an exhibit to any record created for the hearing.

Not having been filed of record in the hearing, the Appellee argues the officer's written statement in his citation could not be relied on for the court's findings of facts.

Since the citation [1] was used (and testified to) during the hearing, it was not error for the court to have considered its contents, even though, through fair inference, the officer's actual testimony covered the same information.

Even so, the trial court's ruling was correct since the information (personally given to the officer by a citizen in the area) was sufficient to support an "articulable suspicion" that criminal activity was afoot and thus justified the stop of the Appellee's car and the subsequent search of his person. Where a citizen exposes himself to an officer, in a face-to-face meeting, who then has the opportunity to evaluate the citizen's demeanor during the relay of the information, further "predictive evaluation" of the information is not an absolute requirement, as a citizen is **not evaluated** as a "confidential informant or anonymous tipster."

## II. BACKGROUND

In the evening of September 4, 1999, Officer Michael R. Koenig was traveling on the Outer Loop in Louisville en route to a domestic disturbance on Third Street, when he was flagged down by a citizen who told him a six foot tall, 170 pound white male with shoulder-length, black, curly hair, driving a late 1970s model black Ford truck with primer on the hood—was in the K-mart parking lot on 191 Outer Loop and was about to conduct a drug transaction. Officer Koenig then immediately left the citizen and proceeded to the K-mart parking lot, which was only a few minutes away, and observed the vehicle and male driver exactly as described and, as he testified, "confirmed my information from the informant." Appellee however, argues that the actual testimony from Officer Koenig established only that when he arrived the vehicle was exiting the parking lot.

Officer Koenig then followed and stopped the vehicle and noted Appellee's frantic movement in the vehicle and once backup arrived, asked the Appellee to exit his truck. Upon observing and inquiring about a large bulge in Appellee's front pants pocket, the Appellee stated it was a crack pipe, which Officer Koenig then took possession of. After recovering the pipe and noting the residue therein, Appellee was arrested. A subsequent search of Appellee's pockets revealed methamphetamine in a cigarette package.

Appellee pled guilty to First–Degree

---

1. KRS 431.015 provides that a citation is issued by an officer only for a misdemeanor or violation committed in the officer's presence; however, KRS 431.450, which provides for the use of a uniform citation by all law enforcement agencies, directs that "[a]ll peace officers in the Commonwealth shall use the uniform citation for all violations of the traffic laws and for all felonies, misdemeanors and violations." KRS 431.450(4). Since the uniform citation is specified as the charging document for traffic offenses, RCr 6.02(2); *Skeans v. Commonwealth*, 912 S.W.2d 455, 456 (Ky.App.1995) ("Uniform citations, like indictments in felony cases, are charging documents in the prosecution of DUI offenses and are not solely 'investigative reports by police.' "), and Appellee was charged with a traffic offense, i.e., No Motor Vehicle Insurance, the uniform citation was properly filed in the court record for that purpose because of its status as a pleading. RCr 8.12.

Possession of a Controlled Substance,[2] Possession of Drug Paraphernalia,[3] and No Motor Vehicle Insurance.[4] He also admitted to being a Second–Degree Persistent Felony Offender and received an enhanced five-year sentence on the Possession of a Controlled Substance charge. The misdemeanor charges, Possession of Drug Paraphernalia and No Motor Vehicle Insurance ran concurrently with the felony charge for a total sentence of five years imprisonment.

Appellee's guilty plea was conditioned on his right to appeal the denial of his suppression motion, in which he had argued that the crack pipe and methamphetamine should be suppressed because the stop violated his Fourth Amendment rights. He contended that the initial corroboration of only his description and location, provided by the "tipster," did not provide Officer Koenig with a "reasonable and articulable suspicion" that criminal activity was afoot.

The Court of Appeals reversed the trial court's denial of the motion to suppress as based on clearly erroneous factual findings, finding that in reaching its decision, the trial court relied on statements in the uniform citation, which had not been offered, or admitted, into evidence. The Court of Appeals further reasoned that without reference to the citation, there was insufficient evidence to support a reasonable suspicion that criminal activity was afoot. We granted discretionary review on the Commonwealth's Petition.

### III. ANALYSIS

### A. TRIAL COURT'S RELIANCE ON CITATION

When reviewing the outcome of a suppression hearing regarding a warrantless search, this Court employs the standard of review enunciated by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

> [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers. *Id.* at 699, 116 S.Ct. at 1663 (cited with approval in *Commonwealth v. Whitmore*, 92 S.W.3d 76 (Ky.2002)).

"The *Ornelas* court recognized that police may draw inferences of illegal activity from facts that may appear innocent to a lay person and that a reviewing court should give due weight to the assessment by the trial court of the credibility of the officer and the reasonableness of the inference." *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky.2002).

At the conclusion of the hearing, the trial judge made oral findings and announced her ruling from the bench. Her findings of fact indicate that she relied upon Officer Koenig's observation of Appellee meeting with another individual in the K-mart parking lot as the determinative "predictive behavior" she felt necessary to support a reasonable suspicion:

> "Well, I certainly understand Mr. Conkin why you cited that case and I think it's something that I have to take into consideration. The *Florida v. J.L.* [529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)] case involved a tip

---

2. KRS 218A.1415.

3. KRS 218A.500.

4. KRS 304.39–080; KRS 304.99–060.

that there would be a black male at a bus stop wearing a plaid shirt and that he had a gun on him. As I read the case that was basically what they were told and the officer went to the bus stop and there was a black male there with a plaid shirt on and he stopped and frisked him and indeed he did have a gun on him.

This case has more detail from the beginning. First, it involves a vehicle that was carefully described as a late 70s black Ford truck, primer on the hood. There was a description of the male as a white male subject six feet tall, I think 150 to 170 pounds is what you said. I didn't get all the poundage written down, but shoulder length hair. That there would be a narcotics transaction at the Kmart parking lot at 191 Outer Loop. **So this officer goes and is in the Winn Dixie parking lot and sees a vehicle matching that description and also sees him leaving the location after meeting up with another subject.** So, by his own observation, he saw something that could indeed be the narcotics transaction. (Emphasis added).

I think that had he driven to the parking lot and simply seen the truck, even though it's more detailed than it was in the Supreme Court case, *Florida v. J.L.*, I might be inclined to agree with you, Mr. Conkin, if he just saw the truck and followed the truck and stopped. But his testimony was that he observed him leaving the location after he had met up with another person and then he followed him and he stopped him and I think that that was appropriate, and then the frantic behavior was enough to certainly add to the reasonable suspicion that he had for the stop in the first instance . . .

\* \* \*

So, it's a closer call than I see sometimes, because I think somebody gives a description and you find someone at that point and place described that meets the description, I think you are most of the way there. **But I think it's this added factor that's reflected in his report and it was in his testimony about meeting up with another subject there** that pushes it over the line from what we had in Florida, which was just an individual at a bus stop wearing a plaid shirt. It wasn't a very detailed description and there was nothing to pair with, besides his actual presence. (Emphasis added).

**Here we had the presence of a truck, a person driving that truck that fit exactly and then the presence of another subject with whom the narcotics transaction could be conducted.** So, accounting for all those factors and the cases that have been decided, I'm going to overrule the motion to suppress." (Emphasis added).

■ "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United Stated v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). As such, "[t]he issue is a preliminary question to be decided by the trial judge, KRE 104(a) . . . ." *Cf. Talbott v. Commonwealth*, 968 S.W.2d 76, 82 (Ky.1998).

■ All would agree that Officer Koenig's statement in his traffic citation that "officer went to above location and subject matching description was just leaving that location after meeting up with another subject," would be sufficient "predictive behavior" to justify the *Terry* stop in this case, even under *Florida v. J.L.*, 529 U.S.

266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *see also, Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

However, the Court of Appeals reversed the trial court on the grounds that the "citation" was not made a part of the "record"—thus, concluding, there was no substantial evidence in the record to support the trial court's finding that Officer Koenig "observed Priddy leaving the location *after meeting up with another subject* ...." What this argument overlooks though, is that the citation **was used** by the parties during the hearing, as well as, having then been reviewed by the court from its record.

In this regard, KRE 104(a) provides "preliminary questions concerning ... the admissibility of evidence shall be determined by the court .... In making its determination it is not bound by the rules of evidence, except those with respect to privileges." *See also,* KRE 1101(d)(1). RCr 8.22 also provides that "pretrial motions raising defenses or objections shall be determined before trial .... All other issues of fact shall be determined by the court with, or without, a jury, **or on affidavits, or in such other manner as the court may direct.**" We can assume that the Commonwealth had a copy of the officer's citation at the suppression hearing, but it is known from the video record that the officer, **counsel for the Appellee, and the court had a copy and used it.**

In fact, Appellee's counsel perused the citation at the hearing in an attempt to impeach Officer Koenig (per KRE 613(a)), as to the time of the arrest and the Miranda warnings.

"Q: Do you have a copy of your citation right handy?

A: Yes I do.

Q: You stated...I assume you wrote the citation, is that correct?

A: That's correct."

Under KRE 613(a), it is necessary to establish that the statement was written by the officer. "Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it ...; and, if it be in writing, it must be shown to the witness, with opportunity to explain it." Thus, here the Appellee referenced it, confirmed its creation and authenticity, and asked questions from it for purposes of impeachment. A practitioner would expect the court, which had a copy in its record, to review the "citation" in conjunction with its reference and use in the proceedings, especially **once it had been authenticated.**

Even aside from the applicability of KRE 104, this court has approved the use of interrogatory answers, not filed as exhibits, as a basis for a trial court's judgment, where the trial was by the court. *See Mid–Southern Toyota, Ltd. v. Bug's Imports, Inc.,* 453 S.W.2d 544 (Ky.1970), wherein it stated:

"They refer to Clay, CR 33...and Clay, CR 36.01, ..., as authority for the proposition that admissions and answers to the interrogatories must be introduced in evidence. The latter comment states only that admissions 'should be' introduced in evidence, and the former comment states only that answers to interrogatories would not constitute judicial admissions unless introduced in evidence. Clearly, in the case **of a jury trial**, admissions and answers to interrogatories would not be evidence unless introduced as such, and normally it would seem the same should be true in case of a trial by the court without a jury. However, **in the latter case the formal admission in evidence really has no significant purpose so as long**

as the parties know the court intends to consider the admissions or answers as evidence, and the parties are afforded the opportunity to make objections of inadmissibility." *Id.* at 550, (emphasis added).

Similarly, although we agree it would be better procedure, we can find no rule that compels the parties, or the court, to create a record of "exhibits" in an RCr 8.22 hearing in front of the court. RCr 8.22 only requires "a verbatim record ... of all proceedings ...." *See also,* KRE 104(a). Which it did in this case. Moreover, the trial court twice, in its discussions and oral ruling (in open court with counsel present) referred to the facts as contained in the report and no objection to this incorporation was made at any time, such that the trial court could have clarified whether, in fact, the court was referring to the citation, or a finding from the officer's testimony that he had "confirmed my information from the informant." "It has long been the law of this Commonwealth that an error would not be reviewed on appeal if the trial court has not had an opportunity to rule on the objection. RCr 9.22 and KRE 103(a)(1)." *Commonwealth v. Petrey,* 945 S.W.2d 417, 419 (Ky.1997).

Thus, aside from the actual testimony of Officer Koenig, the court could have properly considered comments directly from the citation. This is what KRE 104(a) is about, as well as KRE 1101(d)(1) and RCr 8.22. Evidence is what a court is told, knows, sees, or perceives, formally in open court. Exhibits are what are filed in a trial, and by such, become part of the record on appeal. And where there is no objection, as here, in a video proceeding, KRE 104(a) is dispositive. "This means that the judge can bring to bear on those questions evidence that might not be admissible at trial—hearsay without worry about hearsay rules, opinion without con-

cern about opinion rules, documents without concern about the best evidence, etc. There is good reason for this approach ...." Lawson, *The Kentucky Evidence Law Handbook* 4th Ed., § 6(a), p. 62 KRE 104(a) findings, however, must be supported and based upon, "substantive evidence." *Cf. Talbott v. Commonwealth,* 968 S.W.2d 76, 82 (Ky.1998), subject to the further caveat, that counsel are aware of what evidence the court is relying on. *Cf. Mid–Southern Toyota, Ltd* at 550.

The dissent cites many cases from Kentucky, and other jurisdictions, which say that documents not introduced into evidence, may not be considered by the court. These cases support that holding, but only at trial, and most often, in a jury setting. Several of the cases refer only to the "appellate record on appeal" in reference to documents absent therefrom, or added later, in briefs. These holdings do not address questions presented in a pre-trial suppression hearing under KRE 104(a).

## B. OFFICER KOENIG'S TESTIMONY

Aside from consideration of the citation, Officer Koenig testified that when he entered the parking lot, he observed the suspect vehicle and suspect, "and confirmed my information from the informant." The citizen giving the information had flagged him down on the street near the site and informed him of the "drug deal to go down in the parking lot."

Just prior to this "confirmation testimony," the officer's questions and answers were:

"Q: Is that all the information that you received?

A: I received that they would be in the parking lot of 191 Outer loop selling to an unknown subject out of that vehicle.

Q: Did they give you a time or did they say that they were there right now?

A: That they were there as we spoke."

In his answer to the very next question, he testified **"and confirmed my information from the informant."** "[W]e hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers just." *Ornelas* at 699, 116 S.Ct. at 1663. Preliminary questions of fact are to be determined by the trial judge, whose factual findings are conclusive where supported by substantial evidence. *Talbott* at 82.

Were we disposed to hold, as did the Court of Appeals, that Officer Koenig's observation of "Priddy leaving the location after meeting with another subject," was in fact necessary to meet the "predictive behavior" test required for reliance on a citizen's tip—it is our opinion there was testimony of such properly before the court. It was there for proper consideration from (1) the citation perused and authenticated by the Appellee's counsel in examination at the hearing and available to the court from its own record and (2) through fair inference, Officer Koenig testified to this fact when, having already recited the fact of this observation as given to him *from the informant*, he testified he "confirmed my information from the informant."

## C. FINDINGS OF "REASONABLE ARTICULABLE SUSPICION"

■ Even aside from the resolution of the issues in sections A and B, the facts before the trial court supported a "reasonable articulable suspicion" that a drug transaction was about to occur.

In arriving at its conclusion, the Court of Appeals failed to consider the different levels of reliability between tips from a "confidential informant or anonymous tipster" versus that of a citizen, who personally approaches an officer to give information about *ongoing* criminal activity.

"[T]ips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response, or require further investigation, before a forcible stop of a suspect would be authorized. But in some situations—for example, when a victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific pending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

One who personally comes forward to give information that was immediately verifiable at the scene may carry sufficient indicia of reliability to justify a stop and would be a much stronger case than an anonymous phone tip. *Id.* at 146, 147, 92 S.Ct. 1921. *See also, United States v. Christmas,* 222 F.3d 141, 144 (4th Cir. 2000), *cert. denied,* 531 U.S. 1098, 121 S.Ct. 830, 148 L.Ed.2d 712 (2001). (Held that tipster, who failed to give her name, but gave the police her home address, was not an anonymous tipster and that face-to-face informants are generally more reliable than anonymous telephone tipsters).

■ In its analysis of the trial court's finding that the circumstances related by Officer Koenig in the case at hand did not articulate a reasonable suspicion that criminal activity was afoot, the Court of Appeals relied on *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct., 1375, 146 L.Ed.2d 254 (2000). In *J.L.,* the tip came through a phone call made from an unknown location

by an unknown caller. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if their allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity ...." *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *J.L.* at 270, 120 S.Ct. 1375.

However, "[a] face-to-face encounter provides police officers the opportunity to perceive and evaluate personally an informant's mannerisms, expressions, and tone of voice (and thus, to assess the informant's veracity more readily than can be done from a purely anonymous telephone tip). In person communications also tend to be more reliable because, having revealed one's physical appearance and location, the informant knows that she can be tracked down and held accountable, if her assertions prove inaccurate. Finally, a face-to-face encounter often provides a window into an informant's represented basis of knowledge; for example, his physical presence at or near the scene of the reported events can confirm that she acquired her information through first-hand observation." *United States v. Romain*, 393 F.3d 63, 73–74 (1st Cir.2004)(internal citations omitted). In *Romain*, the call came into the 911 emergency operator from a woman who explained she was visiting with her friend and that someone had come in with a gun. When the operator inquired whether the woman was placing the call surreptitiously, the woman asked that the call be traced. The police then responded, whereat, the woman again covertly indicated to the officers that another person was inside the apartment and armed. Her identity, however, was unknown until after the search of the person indicated turned up the weapon complained of. In concluding the search was valid, the court stated "[h]ere, the officers had in-person contacts ..., and those contacts, although limited, allowed them to gauge her veracity and to make some informed assessment of the reliability of the tip ...." *Romain* at 73–74. "The informant here was not 'anonymous' as the *J.L.* Court had employed that term and the information was not, as in *J.L.*, a tip that had no discernable basis." *Id.* at 74.

In *United States v. Sierra–Hernandez*, 581 F.2d 760 (9th Cir.1978), a border patrol agent was approached by a man, described in the record only as wearing farmer's overalls and a baseball cap and driving a late-model brown Mercedes Benz. The man then pointed to a black pickup truck proceeding parallel on a road about 100 yards away and told the officer the black pickup truck had just loaded with weed at the canebreak. Without asking the unidentified man for his name, or for any other information, the agent immediately radioed for assistance and followed the black pickup, stopped it and discovered the marijuana. In commenting upon the identity of the person giving the information, the court acknowledged "[m]oreover, although the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the procedure appropriate. Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly. By thus presenting himself to the agent, and doing so while driving a car from which his identity might easily be traced, the informant was in a position to be held accountable for his intervention. The reliability of the information was thus increased." *Sierra–Hernandez* at 763. The court also noted the timely nature of the information, required the agent to immediately leave the informant's presence, radio for assistance and set off in pursuit. *Id.*

In *United States v. Christmas,* 222 F.3d 141 (4th Cir.2000), the intoxicated woman approached officers who were then in her neighborhood, gave them her residence address, but not her name, and told them "you need to come and deal with the drugs and the guns that those guys have on the porch two doors down from me." *Id.* at 143. Reacting to the information given, the officers approached the individuals indicated, did a pat-down search and found weapons. After the arrest, a more thorough search revealed a large amount of crack cocaine and marijuana. In upholding the search, the court noted, "unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements. As the Supreme Court has observed, citizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints." *Id.* at 144, *citing Illinois v. Gates,* 462 U.S. 213, 233–234, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Adams v. Williams,* 407 U.S. 143, 147 & n. 2, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

In *United States v. Heard,* 367 F.3d 1275 (11th Cir.2004), the officer responded to a location where a fight was in progress. As the officer responded, he observed a woman yelling at the defendant and demanding fifty dollars. At the officer's suggestion, the defendant paid the woman the fifty dollars. However, just as the woman, whose name and address was unknown, was leaving the scene, she told the officers the defendant was carrying a gun. She then jumped on an arriving train and left the scene anonymously. Nevertheless, to protect his own safety and the safety of the train station patrons, the officer placed the defendant in handcuffs and did a *Terry* frisk. During the pat-down, a weapon was discovered and the defendant was later indicted for possession of a firearm by a convicted felon.

In upholding the reasonableness of the search, the court noted "[a] face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant." *Heard* at 1279, *citing United States v. Valentine,* 232 F.3d 350, 354 (3rd Cir.2000).

In *United States v. Hopes,* 286 F.3d 788, 789–790 (5th Cir.2002), the court noted "in the instant case the tip was not anonymous but, rather, was given by Robinson, an individual who had operated the halfway house for many years and was well known to the officers who had dealt reliably with her many times. Unlike the unknown, unaccountable tipster in *Florida v. J.L.,* Robinson personally summoned and met the police officers face-to-face, and could be held accountable if the tip proved to be fabricated." *Hopes* at 789–790.

"Courts are not required to sever the relationships that the citizens and local police forces have forged to protect their communities from crime. [Appellee] argues for a rule that comes close to disqualifying face-to-face discussions with residents as a basis for a *Terry* stop and frisk. To rule out such conversations as a basis for reasonable suspicion would be a serious step. A community might quickly succumb to a sense of helplessness if police were constitutionally prevented from responding to the face-to-face pleas of neighborhood residents for assistance. Officers are entitled to investigate such reports without jeopardizing their personal safety. Any other constitutional rule would destroy the basis for effective community police work." *Christmas* at 145.

In this instance, officer Koenig was stopped and flagged down on the street by a citizen and given information that a nar-

cotics transaction was occurring, right then, in the K–Mart parking lot several minutes away. The officer was given an accurate description of the dealer and his vehicle and told they were there as they spoke. The alleged site of the drug transaction being several minutes away, one would have to concede that the failure to get the name and address of the citizen was understandable, given the timely nature of the information along with the common knowledge that it doesn't take long to conduct a drug transaction.

■ Next, and even viewing the evidence as argued by Appellee, officer Koenig arrived on the scene and immediately spotted the person and vehicle described just moments before. As the vehicle was then exiting the K–Mart parking lot, according to Appellee's version (where the transaction was supposed to have taken place), he followed and blue-lighted the Appellee. After activating the blue lights, but before approaching the vehicle, he noticed the apparent frantic activity of the Appellee inside his vehicle indicating concealment activity. Indeed, "a brief stop of a suspicious individual, in order to determine his identity, or to maintain the status quo momentarily, while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Williams* at 146, 92 S.Ct. 1921. And, "[r]easonable suspicion, while dependant upon the 'totality of the circumstances,' including both the content of the information and its reliability, 'can arise from information that is less reliable than that required to show probable cause.'" *Heard* at 1278. (Internal citations omitted).

Even viewing the evidence as argued by the Appellee, we believe Officer Koenig's stop of the Appellee was based upon "reasonable and articuable suspicions that criminal activity was afoot."

Officer Koenig was flagged down on the street and approached by a citizen who gave him the information, including the necessity of responding quickly. It was under circumstances where Officer Koenig could assess the demeanor of the person giving the information and make his own judgment, as to that person's credibility. Additionally, the person giving the information undertook the risk that the officer, having spoken with her, could recognize her and identify her at a later time thus, subjecting her to various penalties, should the information been proven to be untrue. *See* KRS 519.040(1)(2nd), "Falsely Reporting an Incident."

■ Once the response of the officer validated the description of the Appellee and the vehicle, this added credibility to the information, as well as the fact that it was at the location suggested. Thus, even limiting the evidence as argued by the Appellee, he was then leaving the vicinity of the parking lot where it was reported the alleged criminal activity would have occurred. Then, factoring this into an officer's knowledge that it doesn't take a long time to do a drug deal, this had been consistent with the fact that by the time he responded from the location where he was notified of the activity, to its actual location, the deal might have been completed and the Appellee would be leaving the transaction area. Finally, once stopped, the Appellee's vehicle was not approached; nor was the Appellee asked to exit the vehicle, until after Officer Koenig had also witnessed the frantic activity of the Appellee in his vehicle, suggesting he was then hiding something. "A court inquiring into the validity of a *Terry* stop must use a wide lens and survey the totality of the circumstances." *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581.

Thus, considering the "totality of the circumstances," we believe Officer Koenig

had "reasonable and articuable suspicion of criminal activities afoot," sufficient to justify his search in this instance, even limiting the evidence as argued by Appellee.

For the forgoing reasons, the opinion of the Court of Appeals is reversed, and Appellee's judgment and sentence are reinstated.

GRAVES, JOHNSTONE, ROACH, WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion, with LAMBERT, C.J., joining that dissent.

COOPER, Justice, dissenting.

Appellee, Lloyd A. Priddy, entered a conditional plea of guilty, RCr 8.09, to possession of a controlled substance in the first degree, a Class D felony, KRS 218A.1415; possession of drug paraphernalia, a Class A misdemeanor, KRS 218A.500; owning or operating a motor vehicle without insurance, a misdemeanor, KRS 304.39–080(5), KRS 304.99–060; and persistent felony offender in the second degree, KRS 532.080(2). He was sentenced to an enhanced term of five years in prison. His convictions were premised entirely upon evidence obtained by Officers Michael Koenig and J. Bailey of the Jefferson County Police Department during a *Terry* stop of Appellee's vehicle at the intersection of New Cut and Outer Loop Roads on September 4, 1999. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Appellee moved to suppress the evidence on grounds that Koenig had no legal basis for stopping him, thus the evidence obtained during the search of his person and his vehicle was the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Following a fifteen-minute suppression hearing, the trial court overruled the motion.

The Court of Appeals reversed. The majority of this Court has concluded that the Court of Appeals' decision was in error. Because I conclude otherwise, I dissent and would affirm the Court of Appeals.

## I. SUBSTANTIAL EVIDENCE.

RCr 9.78 provides, *inter alia:*

> If at any time before trial a defendant moves to suppress ... the fruits of a search, ... the trial court shall conduct an *evidentiary* hearing outside the presence of the jury and at the conclusion thereof shall enter into the record findings resolving the essential issues of fact raised by the motion or objection and necessary to support the ruling. *If supported by substantial evidence* the factual findings of the trial court shall be conclusive.

(Emphasis added.)

In response to the trial court's order for a bill of particulars, RCr 6.22, the prosecutor filed in the record the following description of the events leading to Appellee's arrest:

> On September 4, 1999 at approximately 2100 hours, at 191 Outerloop [sic] Road in Jefferson County, Kentucky, Officers received information that the defendant was at 191 Outerloop [sic] Road on the lot of K–Mart, driving a 70's model black Ford pick-up with primer on front part of truck. Through investigation, the defendant matching the description operating a late 70's model Ford pick-up truck with primer *was leaving 191 Outerloop parking lot.* Officer conducted a stop and observed the defendant moving in the vehicle, in a frantic behavior. The defendant was asked to exit the vehicle, for a pat down for weapons. Officer J. Bailey conducted the pat-down and both observed and felt a bulge in front of pants. The defendant produced a crack pipe wrapped

in a red rag. The defendant stated to Officer Bailey that he had some crank in his pants. The defendant was mirandized [sic] and placed into custody. Officer Koenig found Marlboro box which contained a large piece of suspected crank packaged for sale.

Witnesses for the Commonwealth include but are not limited to: Jefferson City [sic] Police Department Officer R. [sic] Koenig, Officer S. [sic] Bailey; Metro Narcotics Unit; Det. F. Kron, Det. P. Ray, Det. D. Mahaffey, Sgt. D. Puckett, Sgt. D. Hogue.

The Commonwealth hereby gives notice of intent to call an expert witness in the field of narcotics should this case proceed to trial.

Note that the bill of particulars does not mention either an alleged narcotics transaction or a meeting between Appellee and another person. Nor does it identify the source of the "information" or indicate that the identity and location of the source was obtained or known by the Commonwealth.

The only witness at the suppression hearing was Officer Koenig. He testified as follows on direct examination by the prosecutor:

Q: Thank you. I want to draw your attention to that day. Do you recall conducting an investigation against a Mr. Lloyd Priddy?

A: Yes, ma'am. I do.

Q: Can you tell the court how that investigation began?

A: Yes, ma'am. I was traveling westbound on the Outer Loop approaching Third Street in my patrol car responding to a domestic violence run on Third Street when I was waived down by a subject and I pulled off to the side. That subject then advised me that there was going to be a narcotic transaction going on in the parking lot at K–Mart at 191 Outer Loop Road involving a late 70s Ford pickup truck, black in color with the hood of the truck primered, with an occupant who is approximately six feet, 150, 170 pounds with black, curly hair, shoulder length, operating the vehicle.

Q: Did that person tell you what type of narcotics were being sold from that location?

A: No he didn't.

Q: And what was the information that you received regarding the narcotics, exactly? That that person would be in possession of them, or—

A: *That that person would be selling the narcotics.*

Q: But they didn't specify what kind?

A: No ma'am.

Q: Is that all the information that you received?

A: I received that they would be in the parking lot of 191 Outer Loop selling to an unknown subject out of that vehicle.

Q: Did they give you a time or did they say that they were there right now?

A: That they were there as we spoke.

Q: And what did you do based on that information?

A: I then went eastbound on Outer Loop approaching the Winn Dixie parking lot, which sits right next to the K–Mart, just west of the K–Mart on Outer Loop. I entered the parking lot to the Winn Dixie which is an adjoining parking lot with the K–Mart and drove slowly through the parking lot and I was riding through the K–Mart parking lot and observed a late 70s model Ford pickup truck, black in color, with a primered hood, with a white male subject with black, curly hair, shoulder length, operating it, and confirmed my information from the informant.

Q: *Did you see any narcotics being sold from that vehicle?*

A: *No, ma'am.*

Q: What did you do when you saw the truck?

A: *When I saw the vehicle, the vehicle was approaching the New Cut road exiting the parking lot.*

Q: And what did you do?

A: I activated my emergency equipment and called for a backup car.

Q: Did Mr. Priddy stop when you activated your emergency equipment?

A. Yes, he did. The traffic stop was conducted at the intersection of New Cut and Outer Loop Roads.

(Emphasis added.)

Officer Koenig then described observing Appellee making frantic movements inside the vehicle as he (Koenig) waited for his back-up officer (Bailey) to arrive. When Appellee got out of the truck, Koenig noticed a large bulge in the area of Appellee's groin which was subsequently determined to be a crack pipe. When asked if he was in possession of any other narcotics, Appellee responded that he had some "crack" in his pants. A subsequent search revealed a Marlboro cigarette package containing a controlled substance.

Koenig never claimed that he saw Appellee meet with another person in the K–Mart parking lot or even that another person was in the parking lot. In fact, when he first saw Appellee's vehicle, it was in the process of exiting the parking lot, and the actual stop was made at the intersection of New Cut and Outer Loop Roads. Much is made in the majority opinion about the information elicited by Appellee's counsel during his three-minute cross-examination of Koenig. Because I agree that the repeated references to Koenig's police report are significant, I have included the following transcript of the entirety of that cross-examination:

Q. Officer Koenig, do you have a copy of your citation there handy?

A. Yes, I do.

Q. You stated—I assume you wrote the citation. Is that correct?

A. That is correct.

Q. You talk about the information that you received and about pulling over the truck that Mr. Priddy was operating. You said that he moved about, and when he came out, he had a bulge in his groin area. Is that correct?

A. Yes, sir.

Q. Then it says, you all observed a large bulge in front of the pants, subject was placed in custody and "Mirandized."

A. When we observed the large bulge in his pants, he was escorted . . . .

Q. [Interrupting] Did you place him in custody at that time—arrest him?

A. No, sir. We actually removed the pipe from his pants and determined that it was a crack pipe with residue in it. At that point, he was placed in custody.

Q. I don't think . . . maybe I missed it about the crack pipe. I don't see it listed here in that sequence when I was listening to your testimony a moment ago. I know it says a pipe was found but I didn't realize it was found at that time. It was found before any crack or anything?

A. Yes. The pipe was found prior. And that's when Lloyd Priddy stated, when we asked him if he had any other narcotics on his person. He stated that he did have crack in his pants and that's when he was placed in custody and "Mirandized"—and we took him to the station.

Q. How long would you say you sat there waiting for your back-up before you got Mr. Priddy out of his vehicle?

A. My back-up caught up at the intersection I was at in maybe ten to twenty seconds.

Q. OK, so he was right there? No further questions.

As we recently held in *Collins v. Commonwealth*, 142 S.W.3d 113 (Ky.2004):

In order to perform an investigatory stop of an automobile, there must exist a reasonable and articulable suspicion that a violation of the law is occurring. Complications arise when, as here, the information serving as the sole basis of the officer's suspicion is provided by an anonymous informant, whose veracity, reputation, and basis of knowledge cannot be readily assessed. In situations such as these, we are required to examine the totality of the circumstances, and to determine whether the tip, once suitably corroborated, provides sufficient indicia of reliability to justify an investigatory stop.

*Id.* at 115 (citations omitted). As in *Collins*, Appellee's motion to suppress is governed by the United States Supreme Court's decisions in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

In *White*, the anonymous tipster told police that a woman would leave a specified apartment in a certain vehicle at a particular time and that she would be carrying cocaine and going to a designated motel. The police observed the described woman leaving the apartment building, entering the vehicle, and driving toward the motel. The police stopped the vehicle and later discovered cocaine in her purse. 496 U.S. at 327, 110 S.Ct. at 2414–15. The Court upheld the stop because it was supported by predictive information, *i.e.*, the tipster not only provided information readily available to a third party, *i.e.*, the description of the woman and her vehicle, but also accurately predicted the future behavior of the woman, *i.e.*, that she would drive toward the motel. *Id.* at 331–32, 110 S.Ct. at 2416–17. Corroboration by the police of those predictions gave the tip sufficient credibility to justify the stop. *Id.* at 332, 110 S.Ct. at 2417.

In *Florida v. J.L.*, the police received an anonymous tip stating that a young, black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun. The tipster gave no information predictive of J.L.'s future conduct. Soon after, two officers arrived at the named bus stop and found J.L., a young black male who was wearing a plaid shirt and standing with two other males. The officers made a *Terry* stop, frisked J.L., and found a gun. 529 U.S. at 268, 120 S.Ct. at 1377–78. The Court held that the search was unlawful since the anonymous tip lacked sufficient indicia of reliability upon which to base a reasonable suspicion. *Id.* at 271–274, 120 S.Ct. at 1379–80.

One purpose of the "anonymous tipster" rule is to preclude a tipster from making a false accusation to the police for the purpose of harassing or exacting revenge against the person accused. *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). The evidence presented at Appellee's suppression hearing was similar to the facts presented in *J.L.* The tip accurately described Appellee and his vehicle— information available to anyone in a position to observe. The tipster's only predictive information was that Appellee was selling narcotics to another person. This information, however, unlike the tip in *White*, was not corroborated. Koenig did not witness a drug transaction or even see another person in the K–Mart parking lot. Although he found a cigarette package containing a controlled substance on Appellee's person, he did not testify to find-

ing any money which might have been the proceeds of a narcotics sale.

Nevertheless, the trial court overruled the suppression motion, distinguishing this case from *Florida v. J.L.* as follows:

This case has more detail from the beginning. First, it involves a vehicle that was carefully described as a late 70s black Ford truck, primer on the hood. There was a description of the male as a white male subject six feet tall, I think 150 to 170 pounds is what you said. I didn't get all the poundage written down, but shoulder length hair. That there would be a narcotics transaction at the K–Mart parking lot at 191 Outer Loop. So this officer goes and is in the Winn Dixie parking lot and sees a vehicle matching that description *and also sees him leaving the location after meeting up with another subject. So, by his own observation, he saw something that could indeed be the narcotics transaction.*

I think that had he driven to the parking lot and simply seen the truck, even though it's more detailed than it was in the Supreme Court case, Florida v. J.L., I might be inclined to agree with you, Mr. Conkin, if he just saw the truck and followed the truck and stopped. *But his testimony was that he observed him leaving the location after he had met up with another person* and then he followed him and he stopped him and I think that that was appropriate, and then the frantic behavior was enough to certainly add to the reasonable suspicion that he had for the stop in the first instance.

. . . .

So, it's a closer call than I see sometimes, because I think somebody gives a description and you find someone at that point and place described that meets the description, I think you are most of the

way there. *But I think it's this added factor that's reflected in his report and it was in his testimony about meeting up with another subject there that pushes it over the line from what we had in Florida,* which was just an individual at a bus stop wearing a plaid shirt. It wasn't a very detailed description and there was nothing to pair with, besides his actual presence.

Here we had the presence of a truck, a person driving that truck that fit exactly *and then the presence of another subject with whom the narcotics transaction could be conducted.* So, accounting for all those factors and the cases that have been decided, I'm going to overrule the motion to suppress.

(Emphasis added.)

Of course, there was no evidence introduced and no claim made during the evidentiary hearing that Koenig observed Appellee meeting with another person in the parking lot or that there was "another subject with whom the narcotics transaction could be conducted." Officer Koenig did not so testify and specifically denied having observed a narcotics transaction. Nor did the prosecutor claim the existence of such evidence during her oral argument on the motion. She only argued that the informant's accurate description of Appellee and his vehicle and the allegation that Appellee was selling drugs to another person justified the *Terry* stop. So why did the trial court make a finding of fact that Koenig observed Appellee meeting with another person?

As can be seen by viewing the videotape of the suppression hearing, the trial court was engaged in reading the clerk's record during Koenig's testimony. A police report found at page 18 of that record and purportedly signed by "M. Koenig" contains a notation that "Officer went to above location and subject matching description

was just leaving that location *after meeting up with another subject.*" (Emphasis added.) Obviously, the trial court based her crucial finding of fact that Koenig observed Appellee "meeting up with another subject" in the parking lot on the statement contained in that report *and* upon her mistaken belief that she had heard Koenig make the same statement during his testimony.

The police report upon which the trial court relied is filed in the clerk's record along with other documents that were obviously part of the original district court record, *e.g.,* criminal history record, fingerprint card, district court docket sheet, district court case jacket. Contrary to the assertion in the majority opinion, *ante,* at 506, Koenig did not testify that he prepared that report or that it was the same report that he was holding in his hand during the suppression hearing. On several occasions, defense counsel directed Koenig's attention to the latter report; yet, Koenig never mentioned the crucial fact of a meeting between Appellee and another person in the parking lot. He did not introduce the report from which he was testifying into evidence *or identify it as a copy of the same document that is found at page 18 of the clerk's record.*

So why was this crucial fact of an alleged meeting between Appellee and another person omitted from the bill of particulars, omitted from Koenig's testimony, and omitted from the prosecutor's oral argument? No doubt, because the statement about the meeting referred not to what Koenig, himself, observed, but to what he assumed based upon the information provided by the tipster. If, as Koenig testified, he first saw Appellee's vehicle as it was leaving the parking lot, he could not have seen Appellee meeting with another person while in the parking lot. Further-

more, if Koenig had observed such a meeting, he undoubtedly would have *"Terry-stopped"* both participants, not just Appellee. Did Koenig recognize this inconsistency in his original report after it was filed in the district court record and prepare an amended report deleting any reference to the alleged meeting? It is certainly unlikely that both the prosecutor and Koenig simply overlooked the most damning "evidence" in his report. More likely, they quite properly omitted any reference to what Koenig merely assumed and limited his testimony to what he actually observed so as not to mislead the trial court. Unfortunately, the trial court was not only misled by the statement in the report that she found in the clerk's record, she also mistakenly believed Koenig had repeated the statement during the evidentiary hearing.

Of course, I agree with the majority opinion that the rules ordinarily applicable to the admission of evidence (except those pertaining to privileges) do not apply to preliminary questions of fact determined by a trial court under KRE 104(a). *See* KRE 1101(d)(1); *Talbott v. Commonwealth,* 968 S.W.2d 76, 82 (Ky.1998); *accord United States v. Matlock,* 415 U.S. 164, 173–74, 94 S.Ct. 988, 994, 39 L.Ed.2d 242 (1974). However, that does not mean that the trial court's findings of fact can be predicated upon information that is not, in fact, admitted into evidence. Remember, RCr 9.78 requires an "evidentiary" hearing and that the trial court's findings be "supported by substantial evidence," not, *e.g.,* "the writing on the wall." [1] *Huff v. Commonwealth,* 406 S.W.2d 831, 832 (Ky.1966) ("These [traffic] citations were filed in the record but do not ascend to the dignity of competent evidence ....") (appeal from judgment following bench trial); *Ray*

---

1. Paul Simon, *Kodachrome,* verse 1, line 7 (Rhino 1973).

*Brandt Nissan, Inc. v. Gurvich,* 726 So.2d 474, 476 (La.Ct.App.1999) ("Evidence not properly and officially offered and introduced into evidence cannot be considered, even if it is physically placed in the record.") (appeal from order issued after show-cause hearing); *cf. Garrett v. Commonwealth,* 48 S.W.3d 6, 16 (Ky.2001) (fact that victim was pregnant was not a fact in evidence even though jury could plainly see that she was pregnant; thus, trial court properly sustained prosecutor's objection to defense counsel's remark during closing argument that "since T.J. was pregnant, she now knew how much penetration constituted sexual intercourse."). The majority opinion disingenuously attempts to avoid the plain language of RCr 9.78 by characterizing this suppression hearing as an *in limine* hearing held pursuant to RCr 8.22. *Ante,* at 506–07.

The majority opinion's reliance on *Mid–Southern Toyota, Ltd. v. Bug's Imports, Inc.,* 453 S.W.2d 544 (Ky.1970), is also misplaced. There, the presiding judge at a bench trial considered a party's answers to interrogatories and responses to requests for admissions in support of his judgment. The answers and responses were in the court record but were not formally introduced into evidence. The opinion held that such was not prejudicial "*so long as the parties know that the court intends to consider the admission or answers as evidence, and the parties are afforded the opportunity to make any objections of inadmissibility.*" *Id.* at 550 (emphasis added). Such did not occur here, probably because the trial court mistakenly believed that Officer Koenig had, in fact, testified that he observed Appellee "meeting with another subject" in the parking lot. Further, the answers to interrogatories referred to in *Mid–Southern Toyota* were sworn to by the party held accountable, CR 33.01(2), thus were admissions that could have been admitted against that party at trial, KRE 801A(b)(1), and could have been explained, if necessary, by supplemental answers; and the CR 36 admissions referred to in that case were judicial admissions, as opposed to evidentiary admissions, which are conclusive and eliminate the need to introduce evidence. *Berrier v. Bizer,* 57 S.W.3d 271, 278–79 (Ky.2001). If the trial court had informed the parties of her intent to consider the contents of a police report filed in the clerk's record, Appellee's counsel could have cross-examined Koenig about the alleged meeting and, perhaps, have learned that it was based on an assumption, not an observation—or that the information was simply incorrect. However, once the trial court ruled on the motion, it was too late to reopen the evidence and further investigate this issue. *Watkins v. Commonwealth,* 105 S.W.3d 449, 451 (Ky.2003) (defendant could not supplement the record of the suppression hearing after the Court issued its findings and overruled his motion to suppress).

## II. PRESERVATION OF ERROR.

The majority opinion's assertion that Appellee somehow failed to preserve this issue by failing to object to the court's findings confuses procedures applicable to the admission of evidence with those applicable to orders and judgments. The trial court did not purport to admit the police report into evidence; thus, there was no evidentiary ruling to which defense counsel could object. *See* KRE 103(a)(1). Appellee moved to suppress the evidence that was unlawfully obtained on September 4, 1999, and that was all he was required to do in order to preserve the issue for appeal.

In actions tried by the court without a jury, the sufficiency of evidence to support the findings of fact may be raised

on appeal without regard to whether there was an objection to such findings or whether there was a post-judgment motion. CR 52.03. In William O. Bertlesman and Kurt A. Philip[p]s, 7 *Kentucky Practice*, § 52.03 (4th ed.1984), it is explained that "[a]n objection of this nature would be a needless formality since the very basis of the final judgment is involved." When the only issue is whether the evidence was sufficient to support the findings of the trial court, there is no need to object or make additional motions. Such objections or motions call for nothing more than review of a completed act and are redundant or worse.

*Eiland v. Ferrell*, 937 S.W.2d 713, 715–16 (Ky.1997) (citation omitted); *cf. Prince v. Commonwealth*, 576 S.W.2d 244, 246 (Ky. App.1978) (error in verdict was one of substance not procedure, thus was preserved by motion for new trial even though defendant did not object to form of verdict when rendered).

### III. ANONYMOUS TIPSTER.

The majority opinion's "even if" argument in this case is that the anonymous tipster was not, in fact, anonymous because he provided his information in person as opposed to, *e.g.*, by telephone. I agree that a face-to-face anonymous tip is more reliable than a telephonic anonymous tip. However, all of the post-*J.L.* cases cited in the majority opinion required some factor in addition to a face-to-face encounter to render the tip sufficiently credible to justify the subsequent *Terry* stop.

In *United States v. Romain*, 393 F.3d 63 (1st Cir.2004), the police responded to a 911 emergency call in which the caller said that "someone's in here with a gun," and advised the police to determine her location by tracing the call. When the officers arrived at the residence, the caller answered the door, identified herself as Margaret Jones, appeared to be frightened, and nodded affirmatively when asked if there was anyone with a gun at the residence. It was not until after this additional information was received that the police confronted the defendant, conducted a patdown search, and found the gun. *Id.* at 66–67. While the Court noted that "[a] face-to-face encounter provides police officers the opportunity to perceive and evaluate personally an informant's mannerisms, expressions, and tone of voice," *id.* at 73, *e.g.*, Jones appeared frightened, the Court's bottom line was: "The informant here was not 'anonymous' ...." *Id.* at 74.

In *United States v. Heard*, 367 F.3d 1275 (11th Cir.2004), the defendant and the female informant were arguing inside a MARTA (Metropolitan Atlanta Rapid Transit Authority) station when the officer approached them. The informant told the officer that the defendant owed her $50.00. The defendant admitted that he owed the money and forthwith paid it to the informant. The woman then told the officer that the defendant had a gun—and the officer testified that she appeared frightened while doing so. While the officer searched the defendant, the woman fled. *Id.* at 1277, 1279. Thus, as far as the officer was concerned, she was, indeed, anonymous. The Court held that the facts that the defendant and the informant were together when first encountered by the officer and that the defendant paid her the $50.00 indicated that there was a relationship between the two, so that the woman probably knew whether the defendant was carrying a weapon. *Id.* at 1279. That and the fact that the woman appeared frightened created sufficient indicia of reliability to support the *Terry* stop. *Id.*

In *United States v. Hopes*, 286 F.3d 788 (5th Cir.2002), the informant identified herself as the operator of a halfway house, who was well known to the police and had

given reliable information to the police in the past. *Id.* at 789–90. Manifestly, she was not an "anonymous tipster."

In *United States v. Christmas,* 222 F.3d 141 (4th Cir.2000), the informant approached officers who were in her neighborhood, gave them her address, and told them that "you need to come and deal with the drugs and the guns that these guys have on the porch two doors down from me." *Id.* at 143. Of course, having given her address and exposed herself to reprisal, she was no longer anonymous; and the fact that the alleged criminal activity occurred only two doors from her residence and in close proximity to the location of the criminal activity lent credibility to her tip. *Id.*

A closer case is *United States v. Valentine,* 232 F.3d 350 (3d Cir.2000), in which a young man approached a police officer at 1:00 a.m. in a high-crime area known for shootings, told the officer that the defendant had a gun, refused to give his name, then departed. *Id.* at 352. The officer also testified that the defendant and his companions had begun walking away when they noticed his police cruiser. *Id.* at 353. The Court held that the facts that the defendant was in a high-crime area known for shootings and walked away when he noticed the police cruiser gave the anonymous tip sufficient credibility to uphold the subsequent *Terry* stop. *Id.* at 356–57.

In the case *sub judice,* the tipster did not give Koenig his/her name, address or any information that would have indicated that he/she had reason to know that criminal activity was afoot in the K–Mart parking lot. Koenig did not testify that he observed anything about the tipster's demeanor that caused him to give credibility to the tip. Nor did he testify that the K–Mart parking lot was a high-crime area where drug transactions often occurred. In other words, he had no information lending credibility to the anonymous tip

except the tip, itself. Under *J.L.,* that is not enough.

In its brief, the Commonwealth cites and quotes *State v. Evans,* 692 So.2d 216 (Fla. Dist.Ct.App.1997) in support of its claim that a tip from a citizen informant is entitled to more credibility than a telephonic tip. What Florida's Fourth District Court of Appeal held in *Evans,* however, was "that an informant's actual name need not be known so long as her identity is readily discoverable." *Id.* at 218. In *Evans,* the informant was the manager of a McDonald's restaurant who was working the drive-thru line when she observed that the defendant was drunk as he placed his order and drove through the line. She called the police and gave her name, her address, her location, and that she was the manager of the McDonald's restaurant. When the police arrived, she pointed out the defendant's vehicle as the suspect vehicle. The fact that the informant's identity was readily discoverable is exemplified by the fact that she testified as a witness at the suppression hearing. *Id.* at 217.

*Evans* was readily distinguished by the very same court in *Solino v. State,* 763 So.2d 1249 (Fla.Dist.Ct.App.2000). There, an unidentified motorist driving a white sport utility vehicle (SUV) informed a deputy sheriff (face-to-face) that he had seen a bottle tossed out of the window of a green Nissan automobile proceeding down the highway in front of the SUV. The deputy did not see the defendant throw the bottle, did not see a bottle on the highway, and did not see the defendant commit any traffic violation. He made the stop based solely on the statement of the unidentified motorist. *Id.* at 1249. In suppressing the evidence obtained as a result of the stop, the court observed that "the driver of the white SUV was ... an anonymous tipster who could not be identified or located and whose information was not corroborated." *Id.* at 1252.

A similar fact pattern occurred in *State v. Rewis*, 722 So.2d 863 (Fla.Dist.Ct.App. 1998), in which the driver of a semi-truck pulled into a highway rest stop, gave sheriff's deputies (face-to-face) the license number of a Firebird automobile that he claimed to have seen "weaving on the road," then departed without leaving any identification. Based on this tip, the deputies stopped and searched the Firebird, which was found to contain a bottle that tested positive for heroin. *Id.* at 864. In ordering the evidence suppressed, the court held:

> Although the deputies were given the tip by a passing driver, for all practical purposes he was an anonymous tipster. His identity is unknown, any means of locating him is unknown, as are his motives for disclosing the information. He might have pointed out the Firebird because he was angered by its driver, ... or been the recipient of an obscene gesture, or for any reason other than the one he gave deputies. The deputies had no way to corroborate the information, and agreed at the hearing that they had not themselves seen anything that would have given them reason to stop the Firebird other than the tip.

*Id.* at 864. *See also Rivera v. State*, 771 So.2d 1246, 1247 (Fla.Dist.Ct.App.2000). As these cases hold, the mere fact that an anonymous tipster imparts his information to the police face-to-face is insufficient, standing alone, to justify a *Terry* stop. Unfortunately, that is all that was proven in this case.

Accordingly, I dissent.

LAMBERT, C.J., joins this dissenting opinion.